Good morning everyone. We're here today for oral arguments. We're going to begin with Appeal 25-1595 Conway v. City of Chicago et al. Mr. Screen we'll begin with you. Thank you your honor. May it please the court my name is Don Screen and together with my colleague Michael Halverstam I represent Michael Conway in this appeal. I'll be using the next six minutes to address the issues that the the protected activity in which Michael Conway engaged and in particular whether his speech was made as a public employee or a private citizen and whether it addressed matters of public concern. Michael Halverstam will thereafter address issues arising under Monell, issues of qualified immunity and other issues that the district court did not discuss in its summary judgment opinion. Because he is a master of the record he will also be in a position to address any questions left unanswered when my time has expired. Your honors we're here on summary judgment which is important because I think what we have here is a fundamental difference of opinion about what this case is all about. To hear appellees tell it this case is about a single incident that occurred on a Sunday in 2018 in which Michael Conway had a disagreement with his boss about whether the Midway runways on that morning were wet or dry. Well nothing could be further from the truth. To hear appellees tell it Michael Conway is trying to elevate this factual dispute into a widespread dispute of constitutional dimensions. He's trying to escalate a personnel dispute into you know a Garcetti-esque type of constitutional proportion dispute that this court should be interested in. Well this court should be interested in it because the FAA was, Chicago's Office of Inspector General was. In terms of, I want to skip, we have limited time, I want to skip to your argument about Mr. Conway speaking as a private citizen. Yes. What about precedent like Fellman versus Minkowski where we held that if an employee is reporting misconduct that happens, misconduct about subjects that happen within their job responsibilities, even if reporting misconduct is not about, not a part of their job responsibilities, that that closes that type of argument that they were speaking as a private citizen. What's your answer to that? Thank you for the question, Your Honor. I would say that that it was not about his job responsibilities. His job responsibilities as his job description itself discloses are limited to those events and occurrences that occur on his job shift. He was not a general manager of airport runway condition reporting. He was a shift worker. His responsibilities began and ended when his shift started and ended. And what did he do when something happened on his shift? He reported it to the managers on duty at that time. And his duties began and ended then. If anything should be escalated beyond that chain of command, it was up to the managers to do that. And it's in large part because managers Terry Thomas and David Kaufman didn't do that that we find ourselves here today. But it was certainly not Michael Conway's duty. Well, but I take it your position is also we find ourselves here today because CMOS ordered him to change a report he had made about the conditions. That's the genesis of Mr. Conway's claim. Right. And so the only thing that those two events have in common is that they involve runway reporting. But Michael Conway was not there to report a disagreement about runway reporting. He went to the FAA and the OIG and OSHA to report systematic and intentional falsification that had gone on, as the FAA found, for a period of at least two years. And widespread corruption because this was happening, not because Costa Cimos wanted the runways to be reported as dry for his own good. This was corruption. A private airline, Southwest Airline, wanted to land its overloaded aircraft on wet runways so they were persistently prevailing on Costa Cimos and other personnel at Midway to change, to falsify, runway conditions to enable heavily laden aircraft to land when they really shouldn't be. Mr. Conway has observed accidents in the past, one unfortunately involving the death of a child when an over laden aircraft slid off a runway and onto a highway. Well this stuck with him and he didn't want to see anything like that happening again. And so when this sort of situation occurred, not just on his watch, when he saw it occurring specialists being subjected to the same kind of treatment, being told to falsify runway conditions, he knew it was much bigger than him. His manager, Joe Ambrosia, told him, Michael this is much bigger than Aaron O'Donnell, this is much bigger than Costa Cimos. You have no idea how high this goes. So I would recommend you just sit down and shut up and not talk about wet versus dry runway conditions. At that time, Conway knew that he was in deep trouble. Everyone who dared to defy management was in deep trouble. Okay, I think I understand your position that even though the timeline begins at this wet dry dispute in February with Cimos, because what Mr. Conway reported was more than that one incident, that takes them out of our precedent saying an employee reporting misconduct does not get First Amendment protection. That's right. And more than that, it's the fact that not only airport operations specialists but employees generally just felt this atmosphere of intimidation and retaliation when they dared to speak up about runway reporting or other issues and the FAA flagged that as itself a safety concern because if employees don't feel free to speak up about safety concerns, then you know, we don't know what could happen because then no one's in charge. No one's going to step in and correct situations that ought to be attended to because they're afraid to speak up and that's exactly what happened in Mr. Conway's case. Thank you, Mr. Screen. Mr. Halberstam, a reference, I will recognize you next for argument. Apologies, do I do anything? No, you go ahead and start and then it's going to run continuously for nine minutes. Any time after four minutes, you'd be cutting into your rebuttal time. Thank you very much. Good morning, Your Honors. May it please the Court. First, I'd like to direct the Court's attention to a special procedural issue that didn't come up in the district court's opinion. The federal rules of civil procedure are not independent, separately conceived tests and rules. They're procedural and equitable system with each rule carefully balancing and calibrated to others to achieve the purpose of deciding cases on the merits and doing so efficiently. On defendant's motion to dismiss, Judge Lee already decided that Conway had alleged specific facts sufficient to succeed on Monell liability and qualified immunity against the defendants if he could prove up his case. Conway proved up all those specific allegations that Judge Lee relied on in the decision on the motion to dismiss and then some. Defendants continued to retaliate after the complaint was filed and after Judge Lee's motion to dismiss. That's also in the record. In essentially overruling Judge Lee on the law and on its application to Conway's specific factual allegations, Judge Daniel moved the goal posts after the parties spent enormous resources on discovery. While the standards on a motion to dismiss and a motion of summary judgment are different, they're calibrated so that this kind of thing should not happen. This also implicates questions of judicial estoppel. I don't follow your argument. The discovery that occurred after the motion to dismiss and before the summary judgment certainly informs the summary judgment call. Judge Daniel wasn't bound by Judge Lee's earlier decision on the motion to dismiss if discovery adduced evidence to the contrary. And we're saying it didn't at all. To the contrary, nothing in discovery accrues to defendant's arguments. In fact, as Mr. Screen was saying, this is about two fundamentally different stories. This was not about a disagreement between Conway and his boss seven months ago. Conway internally reported. He argued with his boss and told him this shouldn't have happened. It's wrong. I won't do it again. I'm here. I'm trying to help you. I don't want an accident to happen. Simos told the OIG that Conway wouldn't do it. He said I was going to kill someone. This is a deposition by the OIG. Conway nonetheless challenged not just that specific incident. It was about the airport's ongoing false reporting of damp runways as wet. The rule is that if 25% or more of a runway is damp... Counsel, I think we're going a little off topic. I'm interested in this idea of, and I pondered this, whether Judge Daniel made a different holding on the availability of a continuing violation doctrine versus you just didn't prove it. And I sort of felt that he did the latter. He didn't necessarily reject Judge Lee's legal holding that you could avail yourself of the continuing violations doctrine here. He just said your client didn't prove enough. But I actually want to focus on... I want to focus on a different potential error that I see, which is Morgan. And so the Supreme Court has said you can consider prelimitations conduct as background evidence. It cannot be the basis for a claim. So Mr. Conway cannot avail himself of claiming an adverse action before August of 2018, correct? Correct. And he cannot claim that as damages the period between... he cannot claim compensatory damages for the period prior to August 2018, correct? Correct. That was Judge Daniel's ruling. We disagree, but we're not here to challenge it. Right, but there's a different question, which is can those statements be used as background evidence? Exactly. That's what we're proposing. It's absolutely improper to exclude all those evidence from all considerations of a purpose, intent, and all the other issues. We're not claiming damages on behalf of that earlier retaliation or even protected speech. Oh, sorry. We can, in my opinion, a claim protected speech so long as the retaliation happened after the statutory cutoff, right? Well, you're claiming a continuing violation theory, which Judge Daniel rejected. No, we're not. Are you trying to sweep in? You're not. Not at all. No, what I'm trying to sweep in is the protected speech, which is Conway's action. Are you talking... That's not cut off. So the speech we're talking about, just so we're all on the same page, are the reports to the three agencies. Right, in September and October 2018. That's what we're talking about, but the other speech shouldn't be off the table. Judge Daniels didn't even address it because he said that's all excluded. Off the table as background evidence only. No, as evidence of protected speech, not as evidence of retaliation. So we cannot claim damages on the basis of Conway's speech on August 23rd, but if two days later he gets retaliated against, that's within the statute of limitations. So that's just an important point, but it's not necessary for us to prevail. Would you like to reserve the remainder of your time for rebuttal? Thank you, Mr. Halberstam. Thank you. Mr. Smith will now move to you on behalf of the Plaintiff Michael Conway spoke as a public employee, not as a private citizen on a matter of public concern, when he complained about an incident related directly to his central job duties as a Chicago Department of Aviation employee and spoke up only many months... Counsel, I want to focus on the record. So Judge Daniel did not... He mentioned in the facts section of the opinion that there had been a meeting between, or a phone call I don't recall, between Mr. Conway and an HR person where the HR person directed him to to make these complaints to this agency. This wasn't considered at all by Judge Daniel in his analysis, correct? Not that I recall from his opinion. Right, it's not. Why doesn't that create an issue of fact in terms of what was motivating Mr. Conway's speech? Sure, well I would just emphasize that the timeline here is undisputed. There is the... But isn't that a relevant fact though, that his first complaint comes after a meeting with HR? A meeting with HR... Where discipline is not actually discussed. Sure, well I would emphasize that it was made in the context of his impending discipline. Perhaps it wasn't expressly discussed at that meeting, but we know that he had the very serious runway incursion as of September 5th. But why doesn't that turn into a disputed fact for the jury to decide what was motivating Mr. Conway's speech? I mean, we just have to look at the overall context and content of the speech and we think everything in the record really... Well, if you consider sort of going upon the questions I asked your friend on the other side, it seems to me that the district judge thought he had to put blinders on to anything that happened prior to August of 2018, which is not what the Supreme Court has instructed us, right? And so you have this pre-August 2018 speech from Mr. Conway, something to the effect of, I'm afraid people are going to get killed, God forbid something happens. I believe he had been there during the prior midway runway accident in 2005. So if you consider that, why doesn't it become a jury issue as to what was really motivating Mr. Conway? Well, I offer two points there. First of all, I don't believe if you look at the briefing, plaintiff has really developed this argument that it was erroneous to cut off this, you know, prior speech. I saw a sentence or two in the brief, so I think it was... it's there. Okay, well I guess I would also say that, you know, his excuse for why he waited so long is that he was concerned about public safety but afraid to speak out. I don't think that's a reasonable excuse under the totality of facts in the record. Why is that not reasonable when the FAA found there was a culture of retaliation and intimidation? It seems to me that that HR meeting is key to his theory for a jury to decide the issue as to what was motivating him, no? Well, it's specifically not reasonable because he said he was afraid to speak out, but he wasn't. We know he was complaining inside the office just two days after the incident to a couple co-workers and to Simos himself. Wasn't he told... I think there was some colorful language used to not speak about wet-dry anymore. Isn't there evidence of that? I mean, I believe the testimony regarding the conversation he had with Simos is that he said, don't do this to me again, do not interfere with my notice to airmen calls, and Simos agreed. And there's no allegation that Simos interfered at any point after that. So I think it was a heated conversation, but that was the ultimate upshot of the conversation as Simos agreed to not, you know, do anything like this again. And I would also emphasize that in March of 2018 he also was complaining, and this is just a few weeks after the incident, outside the office to the Southwest Airlines employee. So he's speaking up inside and outside the office in the days and weeks after this took place. But don't you think it's a theory that he was emboldened or encouraged when the HR person said you should complain to an agency? Why shouldn't a jury decide that? I simply think that overall in the content, in the context of the speech, this is all contextual questions. I think it's also worth considering the content of the speech because it's not disputed. You can look at, for instance, the OIG intake report which documented his phone call, and I would emphasize there that he did report this incident that took place on February 17th. I would just note plaintiff is trying to say that he was reporting a larger systemic issue. He has only one example of this ever taking place and it's the only one he reported in these phone calls. He otherwise was complaining that he felt like he was being treated like a janitor, that some of his job duties such as touring interns... But the FAA isn't, can't necessarily fix that, right? The FAA has a mission which is safety and regulation of airlines. Nonetheless that is what he complained about to the oversight agencies which I think evinces the very personal focus of the communications here. I would just analogize this case to, say, Kokinis, Metzger, Clark, where the speech could possibly have addressed something of interest to the public, but if you look at the totality of the record, the content and context of the speech, it militates in favor of the conclusion that it was made for the purpose of shielding himself from discipline. I would also argue that at a minimum... But isn't that making an inference for the defendants? At summary judgment, inferences must be made for the non-moving party. I know there were cross motions here, but essentially, like when I'm looking at the FAA report and I don't know how many individuals were interviewed, this wasn't about discipline to Conway. This was about safety of the runways. Perhaps that's what the FAA's final report was about, but you have to look at what he actually said to them, because the key consideration here is what was his speech act, and I think it's a very personal thing that focused on a lot of these grievances he had in the workplace. Let me ask a different way. If we disagree with the district court on its singular conclusion that Mr. Conway was motivated to protect his own self in the face of impending discipline, do you still win on this point, and why? On this argument? I believe, well, there are cases that say if it was a mixed motive, that is not enough for a defendant to prevail, so I won't argue against those precedents. I think, yes, the court has to make inferences at the summary judgment stage, but they have to be reasonable inferences, and we think the only reasonable inference here is that he spoke for a purely personal matter. And whether speech is First Amendment protected is a legal question under Connick. It's the Connick standard of whether the context of the speech reveals whether the speech covers a matter of public concern that, under Supreme Court case law and our case law, is a legal question, correct? Yes, Your Honor. I would just argue that, in addition, you know, even if we don't prevail on this issue, two points. I think Simos and O'Donnell, as the individual defendants, would be entitled to qualified immunity here. The cases that Conway relies on here, Gustafson and Kristofek, don't have the features of the specific factual context here, which is the long gap before the reporting, as well as the impending discipline. So we don't think this is squarely decided by the precedent in this factual context in Conway's favor. So that's an additional argument on that issue, and I believe we also prevail on the issue of whether he spoke as a public employee. Indeed, this court has repeatedly addressed the issue of public versus private speech in the context of the reporting of misconduct. The court summed it up well in McCardell v. Peoria, where it stated that an employee's commentary about misconduct affecting her area of responsibility is speech as an employee, even if her job duties don't include investigating and reporting misconduct. So that raises the question, what was Conway's area of responsibility here? I believe the evidence on this point is clear and undisputed. We know that Conway was tasked with making these conditions assessments, such as whether the runways were wet, and issuing the notice to airmen reports in the FAA's system. Therefore, when he reported Simos' instruction to update the notice to airmen report, that was commentary about his area of responsibility. We disagree with the assertion that he was reporting a larger systemic issue, but even if he was reporting several instances of, you know, instructions to change notice to airmen reports, that's still his central area of responsibility. And in Conway's own telling, he raised these reports so he could carry out his job duties. He attempts to raise a number of distinctions in this area that are really not supported by this court's case law. So I'd mentioned that he argues that he cannot have spoken as an employee because he did not wield any supervisory authority. That's absolutely not required. I would note, for instance, the Spiegele case, which involved a gate guard at a corrections facility. That's not a supervisory employee. We also have the Olry v. Reichart case, where a vice principal reported the conduct of the superintendent. Obviously, a vice principal does not supervise a superintendent, and therefore, you know, it's pretty analogous to what happened here. We don't allege that Conway supervised Simos, but nonetheless, Simos' conduct affected his area of responsibility, and that's the core of the analysis. He also argues that it's relevant that he spoke outside the chain of command. I think that's also not in line with this court's cases. I could offer many examples. The Olry case, for example, the vice principal went over her supervisor's head to speak to a member of the school board outside the chain of command. The Trugillo case that we cite is even more striking. There, it was an Illinois Department of Corrections procurement employee who made reports to the Illinois Attorney General and even the FBI. Her speech was deemed to be public employee speech. There's also the Tamayo case, which plaintiffs cite in their reply brief, in which the employee, I believe, of the Illinois Gambling Board spoke to a legislative committee. So there's no requirement under this court's precedence that speech must be made to one's supervisors or within one's agency for it to qualify as employee speech. That wouldn't really make a lot of sense after Garcetti, where the Supreme Court made clear that there's no sort of whistleblower carve-out. Obviously, a whistleblower is very likely not going to be reporting directly to their supervisors. They're going to take a report, you know, higher up the chain of command or outside their agency, but there's no, as this court emphasized in the inquiry, no whistleblower carve-out in this context. And certainly, when it comes to the issue of qualified immunity, Conway cannot say that this issue is clearly resolved in his favor under the precedence. So again, Simos and O'Donnell, we believe, are entitled to qualified immunity on these issues. Finally, I'd just like to briefly address the Monell issue. We believe that, first of all, Conway is now arguing that the ruling was not in line with the motion to dismiss ruling. That's another argument that I don't believe was developed in the briefing, so I would simply say that that's waived. In any event, we're at summary judgment. We have to look at the record evidence, and the record evidence here simply does not support the predicates for the city's liability under Monell. So Conway argues for both a widespread practice theory and a act of official with final policymaking authority, but neither is borne out by the record here. As to widespread practice, this court has emphasized again and again, you need much more than one example or even three examples of the underlying constitutional violation at issue. But all Conway discusses are events related to his singular claim of retaliation. You can, you know, scour the briefing. There's not even a single other case cited of another Chicago Department of Aviation employee being penalized in any way for speaking about safety or anything comparable to what happened here. So there's simply no widespread practice on this record. If there were, there would essentially be respondeat superior liability just based on the acts done to Conway here, but that's exactly what Monell was trying to avoid, was imposing respondeat superior liability against municipalities. Counsel, I can't locate the exact document that I'd like to ask about, but I think you'll know what I'm talking about, which is the FAA, I think it's called an alert letter or something along, something like that, where it finds that there was a culture, and I think the words were retaliation and intimidation. What do you think is the consequence of that letter putting the city on notice of potential retaliation or existing retaliation? I think the FAA said something like when it spoke to certain employees they felt discouraged from open communication and therefore it made this observation about the city's culture. Even if that's not a positive observation, I think when it comes to Monell, you actually have to come forward with examples of the constitutional violation. None of the oversight agencies cited a single case of actual retaliation, so even if there was an observation that there was some sort of culture of not feeling comfortable speaking out, that's not the same as an actual constitutional First Amendment retaliation claim, and there are no other examples of that taking place. Conway simply didn't bring them forward in this record. I understand. Do you think it's ironic, though, if the FAA found there was this culture of intimidation or retaliation? It's sort of a circular argument because perhaps there wouldn't have been another one because they were too afraid to complain. What do you say to that? I mean, I guess I would assume that a culture is created based on some incidents that would give rise to people's trepidation to speak out. Conway had ample discovery here. He had an opportunity to go find other employees who may have purportedly suffered from retaliation. A lot of CPA employees were deposed in this matter. Despite all of that, I think it's remarkable that there's not a single other case that Conway has even attempted to identify of actual retaliation. He just relies on this general observation. You know, the FAA can make mistakes. I mean, it's what they observed. We have to live with that in this record, but you would think if the observation was correct, Conway could have found at least one employee who could have offered some sort of example that they were retaliated against, but despite the many CDA employees deposed in this case, he's not offered even a single other example, and I think that's the key point when it comes to liability. Thank you, Mr. Smith. Thank you. Mr. Halberstam, rebuttal argument. Your Honors, defendants rely entirely on disputed facts. We do not have the time here to go through all of the facts. On qualified immunity, the facts need to be construed in favor of the plaintiff, the Supreme Court in a 2014 decision overturned the Fifth Circuit, stating the district court judge took disputed facts into his determination about qualified immunity. That shouldn't happen. On Monell liability, we believe that the facts set forth on pages 13 and 14 in our opening brief are sufficient to proceed under both independently the final decision maker and widespread pattern in practice arguments. First, to widespread pattern in practice, because it's the most difficult, I refer this court to Polk County, to J.K.J. versus Polk County, a single plaintiff case and its recent decision in, I think it's just this year, Miller versus George. I'm sorry, I have to find this. I'll give it to you. Our case compares, is stronger than both cases. In Polk County, the court held that Polk County failed to detect, prevent, monitor for prison sexual abuse of one lowly correctional officer of two prisoners. The allegations, though, were a series of abuses. No, one. There was no... I happen to be familiar with the case. There are a series of abuses over years of those two particular defendants. Which is why Mr. Smith is offering the argument that the plaintiffs have only indicated one instance. Right, but this is not a one incident case. What we have here is multiple top officials in multiple city departments over a course of years taking retaliatory actions against Conway with knowledge he's a whistleblower, with the knowledge that he'd made career-ending accusations against the defendants, and with knowledge of the retaliation, not just notice. That's in the facts. Thank you, Mr. Halberstam. Thank you, Mr. Screen. Thank you, Mr. Smith. The case will be taken under advisement.